**REFAC INTERNATIONAL, LTD.** and Forward Reference Systems, Ltd., Plaintiffs,

v.

**LOTUS DEVELOPMENT CORPORATION,** Defendant.

No. 89 Civ. 5094 (SS).

United States District Court, S.D. New York.

April 18, 1995.

Epstein Becker & Green, P.C. (Kenneth J. Kelly, Claudia M. Cohen, of counsel), Elias, Goodman & Shanks (Paul Goodman, of counsel), New York City, for plaintiffs.

Baker & Botts (Henry B. Gutman, Kerry L. Konrad, Jeffrey E. Ostrow, of counsel), New York City, for defendant.

## FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER

SOTOMAYOR, District Judge.

The quid pro quo for obtaining a patent, and thereby securing its seventeen-year exclusive right to make, sell, and use an invention that the constitutionally-authorized, government-granted monopoly provides, is that adequate disclosure of the invention be made in the application for the patent. *See* 35 U.S.C. § 112. The patent application must teach the world, or at least those in the world who are "skilled in the relevant art," how to make the invention. *Id.*

The action before me involves a claim by plaintiffs REFAC International, Ltd. and Forward Reference Systems, Ltd. (collectively "REFAC")[1] that defendant Lotus Development Corporation ("Lotus"), the manufacturer of some well-known "spreadsheet" computer programs, infringed REFAC's Patent, number 4,398,249 (the "Patent"). Lotus has denied the infringement and has raised an affirmative defense that REFAC's Patent was procured through inequitable conduct before the U.S. Patent and Trademark Office (the "PTO"). Because a meritorious defense of inequitable conduct would render the Patent unenforceable and thereby defeat any claim of infringement, a separate bench trial, which is the subject of the instant Order, was

held on the affirmative defense under Fed. R.Civ.P. 42(b).

Lotus's allegation of inequitable conduct concerns the disclosure requirement of 35 U.S.C. § 112. Lotus maintains that REFAC convinced the PTO that its disclosure was adequate by fraudulently omitting material information about purportedly "disinterested" individuals who had submitted affidavits attesting to their belief that, standing alone, the disclosure in the patent application could teach them to make the subject invention. The material omissions involved prior employment by the applicants, as well as contact with and knowledge of the invention process by the affiants. REFAC denies that the omissions at issue were material or that its predecessors-in-interest intended to commit a fraud upon the PTO. For the reasons discussed below, I find that inequitable conduct occurred before the PTO and that the Patent should be rendered unenforceable.

## STIPULATED FACTS

I adopt as findings the following undisputed facts agreed to by the parties in their Joint Pre–Trial Order dated July 20, 1993:

1. Defendant Lotus is a Delaware corporation with its principal place of business in Cambridge, Massachusetts.

2. Plaintiff REFAC International, Ltd. is a Nevada corporation with its principal place of business in New York, New York.

3. Plaintiff Forward Reference Systems, Ltd. [ ("Forward Systems") ][2] is a corporation organized pursuant to the laws of the Province of Ontario, Canada, with its principal place of business in Downsview, Ontario, Canada. Forward Systems is controlled by Rene K. Pardo ("Pardo") and Remy Landau ("Landau"), who are citizens of Canada.

---

1. The Patent was issued to Remy Landau and Rene K. Pardo on August 9, 1983. Thereafter, they assigned all rights and title to the Patent to Forward Systems. On July 10, 1989, Forward Systems granted a 5% interest in the Patent to REFAC in exchange for its promise to sue two of the original defendants in this action within one month of the licensing agreement. REFAC commenced the suit and thereafter joined Forward Systems as a party as a result of an Order dated May 29, 1990 by the Honorable Michael B. Mukasey who had granted defendants' motions to

dismiss the Complaint unless Forward Systems was joined as a necessary party. REFAC voluntarily dismissed its Complaint against the defendants other than Lotus before serving its Amended Complaint adding Forward Systems as a party.

2. The text of the stipulated facts is taken directly from the parties' Joint Pre–Trial Order. Any text I have added appears in brackets.

4. On August 12, 1970, Pardo and Landau filed an application for U.S. Letters Patent entitled "A Process and Apparatus for Converting a Source Program Into An Object Program" (the "Patent Application").

5. By office action mailed July 22, 1971, the U.S. Patent and Trademark Office (the "PTO") rejected the claims of the Patent Application on the grounds of, among other things, inadequate disclosure of the invention under 35 U.S.C. § 112(1), (2) and (3).

6. In response, Pardo and Landau filed an Amendment to the Patent Application on October 15, 1971 (the "October 1971 Amendment").

7. In connection with the October 1971 Amendment, Pardo and Landau also submitted an affidavit executed by Pardo (the "Pardo Affidavit") stating, among other things:

"[T]hat in view of the facts given above, I believe that the presence of the flow chart of Figure 2 and the accompanying description in the specification of Application Serial No. 63,185 represent a sufficient disclosure to carry out the desired functions of the digital computer, and as such, would therefore be a full disclosure of the programming necessary to enable one with ordinary skill in the art of computer programming to make and use this invention."

8. By office action mailed February 1, 1972, the PTO issued a "Final Rejection" of the claims of the Patent Application (as amended by the October 1971 Amendment) on the grounds of, among other things, inadequate disclosure under 35 U.S.C. § 112(1), stating:

"the disclosure is not deemed of the level which would enable one with ordinary skill in the art to make and use the invention. The flow diagram which applicants represent in figure 2 is not of the detailed level which a programmer would need in order to write a program from. The general outline shown in figure 2 will still have to be broken down into fundamentals of what is necessary to write a program."

9. The PTO did not deem the Pardo Affidavit (along with the amended claims) "suffi-cient to warrant a withdrawal of the objection and rejection", stating:

"It should be pointed out that *an affidavit by applicant is self serving and therefore has very little probative value in a response to an objection that the specification is inadequately disclosed.* By filing an application, applicants have indicated that it fulfills the statutory requirements set out in 35 U.S.C. 112, and an objection by the Examiner that the disclosure does not meet the conditions set out there, cannot be overcome by an affidavit by an applicant that it does. [Emphasis added.]

"A challenge by the Examiner should put an applicant to his proofs. A declaration by coapplicant is no more probative of the sufficiency of the disclosure than the specification as originally filed, which has been objected to."

10. In further response to the Final Rejection, Pardo and Landau filed an Amendment Under Rule 116 (the "Rule 116 Amendment") with the PTO on June 29, 1972. Pardo and Landau also filed a "Joint Statement of Rene K. Pardo and Remy Landau" (the "Joint Statement") to show that detailed coding was in existence prior to the filing date of the application, and a second affidavit executed by Pardo (the "Second Pardo Affidavit") in support of the Rule 116 Amendment to show that "the claimed invention was actually successfully practiced as early as August 12, 1970."

11. In the Rule 116 Amendment, Pardo and Landau stated, among other things, that "the present invention is directed to the computer scientist or compiler writer, not a mere programmer, and it is such compiler writer who is the man of 'ordinary skill in the art' who would practice the invention as defined by the claims." Pardo and Landau sought to "overcome" the rejection on the ground of inadequate disclosure by showing that "the man of ordinary skill in the art, the compiler writer, and even a mere programmer of ordinary skill in the art, could produce a program (as was actually done) from Applicants' disclosure."

12. To make this showing, Pardo and Landau submitted with the Rule 116 Amendment the affidavit of Peter H. Jones

("Jones"). They also submitted the affidavits of Robert F. Bullen ("Bullen") and David H. Cikra ("Cikra") (collectively, the "Affidavits").

13. At the time that the Rule 116 Amendment was filed, Pardo and Landau controlled an entity called Lanpar Ltd. ("Lanpar"), which marketed computer software programs including LANPAR (the "LANPAR Program") and OUTCOM.

14. The LANPAR Program was offered commercially by Lanpar as of the date of the Patent Application, and had been licensed for use by third parties as of that date.

15. The LANPAR Program and OUTCOM contained Pardo and Landau's best implementation of the invention claimed in the Patent Application. The Program (a portion of which is described in the Joint Statement) is described by Pardo as the "actual implementation of the invention as it existed as of August 12, 1970 in relation to Fig. 2 of the patent application drawing", which "claimed invention" Pardo averred in the Second Pardo Affidavit "was actually successfully practiced on a General Electric 400 Series Time Sharing Computer at least as early as August 12, 1970."

16. At the time that the Rule 116 Amendment was filed, Pardo and Landau were represented in the proceedings before the PTO by R. Gale Rhodes, Jr., Esq. ("Rhodes"), of the firm of Popper, Bain, Bobis, Gilfillan & Rhodes, located in Newark, New Jersey.

17. It was Rhodes who conceived of the idea to submit "third-party" affidavits to the PTO to overcome the Section 112(1) rejection, after receipt of the Office Action dated February 1, 1972, and prior to the interview with the PTO on April 12, 1972.

18. Prior to submission of the Rule 116 Amendment, Rhodes states that he advised Pardo and Landau to seek what Rhodes refers to as "third-party affidavits" to submit in its support.

19. Pardo and Landau identified and selected the persons who submitted the Affidavits. Landau also personally collected information as to the background of Cikra and furnished that information to Rhodes.

20. Jones worked for not more than eight weeks at Lanpar learning internal details of the LANPAR Program. His job included his becoming capable of correcting "bugs" and making improvements to the LANPAR program. Jones quit Lanpar at the end of February 1972.

21. After Jones left Lanpar, he was asked by Pardo or Landau to submit an affidavit to the PTO stating his opinion that, using only the disclosures in the Application and knowledge of programming techniques known to him on August 12, 1970, he could have written on that date a detailed computer program that would have carried out the process described in the Application.

22. The Jones Affidavit contained statements regarding his education and portions of his employment background for the period prior to the execution of his affidavit in June 1972.

23. By letter dated March 16, 1972, which was copied to Pardo, Rhodes forwarded to Jones a draft of his affidavit and, in that letter, Rhodes asked him to "review the Affidavit for truth and accuracy, and also please advise if I have made any omissions concerning your education and professional background."

24. The Jones Affidavit concluded as follows:

"[F]rom the written disclosures and flow chart shown in the drawing of such patent application, he could have produced as of August 12, 1970, and prior thereto, and using only programming techniques known on and prior to August 12, 1970, the necessary coding and could have written a detailed computer program therefrom."

25. Jones was not asked to, and did not perform any experiment to confirm the opinion expressed in his affidavit.

26. Neither the Rule 116 Amendment nor the Jones Affidavit disclosed the following facts:

(a) Jones worked for Lanpar for not more than eight weeks in January and February 1972, less than six months prior to executing his affidavit.

(b) While at Lanpar and prior to executing his affidavit, Jones learned internal details about the LANPAR Program and acquired an understanding of its concepts.

(c) While at Lanpar and prior to executing his affidavit, Jones received personal instruction from Landau in the internal logic of the LANPAR Program, observed the LANPAR Program in operation, and examined source code listings, flow charts and other written explanatory materials relating to it.

(d) While at Lanpar and prior to executing his affidavit, Jones drafted the text for what became the introduction to what was later produced as the LANPAR Program Logic Manual.

27. At the time that the Jones Affidavit was submitted to the PTO, Landau knew these facts, but these facts were not disclosed to the PTO.

28. At the time he executed his affidavit, Bullen was employed by Bell Canada and assigned by Bell Canada to an entity called CANSAC–BIS, which was a consortium of various Canadian telephone operating companies.

29. On or about May 26, 1972, Rhodes forwarded a draft affidavit to Bullen "as discussed with [Bullen] by Remy Landau" and requested Bullen's comments. By letter dated May 31, 1972, copied to Pardo and Landau, Rhodes stated to Bullen as follows:

"If you believe yourself to be able to swear to the facts set forth in your affidavit, please execute the affidavit and return it directly to me at the above address.

"If there is any problem whatsoever with the affidavit, please call me collect at my above office on next Monday, June 5, 1972, to discuss any possible changes."

30. By letter dated June 2, 1972, Rhodes forwarded to Bullen a revised affidavit reflecting the "changes" Bullen requested. By letter dated June 7, 1972, Pardo wrote to Rhodes stating that Pardo would send the executed Bullen Affidavit to Rhodes at a later date.

31. Bullen either drafted or supplied the description of his education, experience,

knowledge of data processing machines and programming languages, and accomplishments contained in pages 1 through 6 of his affidavit.

32. Rhodes, not Bullen, drafted the language contained in the final paragraph of the Bullen Affidavit.

33. The final paragraph of the Bullen Affidavit stated as follows:

"[H]e has read the specification and studied FIG. 2 of the above-referenced patent application, and from his experience as outlined above, it is his opinion that there is sufficient information included therein for such material (specification and FIG. 2) to have been given to a software programmer of average programming ability, at a time prior to August 12, 1970, with the confident expectation that such average programmer could have written a program, using programming techniques known prior to August 12, 1970, to carry out the process disclosed in the specification and FIG. 2."

34. In adopting the opinion expressed in the final paragraph of his Affidavit, Bullen performed no analysis beyond an attempt to understand the Patent Application sufficiently to explain the process it described to a systems programmer of average competence. For purposes of his opinion, Bullen assumed that if he could explain the process, such a programmer could implement it by writing the necessary program code. Bullen himself made no attempt to write such code or to create a flow chart for such a program.

35. Neither the Rule 116 Amendment nor the Bullen Affidavit disclosed the following facts:

(a) Some five or six years prior to executing his affidavit, Bullen had worked with Landau when the latter was employed as a computer programmer at Bell Canada and Bullen was a consultant employed by UNIVAC Canada.

(b) Prior to executing his affidavit, Bullen was informed by Pardo and Landau that a program implementing the claimed invention in the Patent Appli-

cation was already in use at Bell Canada.

(c) At the time Bullen executed his affidavit, the LANPAR Program was licensed to Bell Canada and used by it to perform useful work.

36. At the time that the Bullen Affidavit was submitted to the PTO, Landau knew these facts, but they were not disclosed to the PTO.

37. At the time he executed his affidavit, Cikra was employed by an entity called Datalogics, Inc. ("Datalogics"), and had primary responsibility at Datalogics for systems software.

38. In connection with the preparation of their respective affidavits, Rhodes spoke to Cikra on more than one occasion and with Jones on at least one occasion.

39. Cikra provided biographical information to Landau in connection with the preparation of his 1972 affidavit, including that he had written four "sorting" programs and a "compiler" program as part of his college course work. This information was included with other information in a document prepared by Landau which was thereafter forwarded by Landau to Rhodes.

40. On or about May 26, 1972, Rhodes forwarded a draft affidavit to Cikra "as discussed with [Cikra] by Remy Landau" and requested Cikra's comments. By letter dated May 31, 1972, copied to Pardo and Landau, Rhodes wrote to Cikra as follows:

"If you believe yourself to be able to swear to the facts set forth in your affidavit, please execute the affidavit and return it directly to me at the above address.

"If there is any problem whatsoever with the affidavit, please call me at my above office on next Monday, June 5, 1972, to discuss any possible changes."

41. By letter dated June 1, 1972, Rhodes forwarded to Cikra a revised affidavit, which letter stated that "changes" had been "requested" by Cikra. By letter of the same date, Rhodes sent Pardo and Landau a copy of the draft sent to Cikra.

42. Neither the Rule 116 Amendment nor the Cikra Affidavit disclosed the following facts about Cikra:

(a) While employed at Datalogics and less than three months prior to the time he executed his affidavit, Cikra had assisted Landau and Pardo in performing the programming necessary to convert a version of the LANPAR Program to operate with the Datalogics software systems, for the eventual use of the Ohio Bell Telephone Co.

(b) While converting the LANPAR Program to the Datalogics system over the course of several days, Cikra reviewed portions of the LANPAR Program source code as particular and specific needs arose.

(c) Prior to the time he executed his affidavit, Cikra had observed the LANPAR Program being used as well as other documentation relating to it.

43. At the time that the Cikra Affidavit was submitted to the PTO, Landau knew these facts, but these facts were not disclosed to the PTO.

44. In the Rule 116 Amendment, Pardo and Landau identified Cikra as "a programmer of ordinary skill", in contrast to Jones, whom they identified as "a computer scientist or compiler writer".

45. The Cikra Affidavit disclosed that Cikra took two courses in systems programming while at Case Western Reserve University from September 1966 to June 1967, but neither it nor the Rule 116 Amendment disclosed that those courses required the writing of sort programs and compilers, or that in connection with those courses Cikra wrote four sort programs and one compiler.

46. Cikra does not now have and never had any interest in the outcome of this action nor did he have any interest in any business or venture of Pardo and Landau or in the '249 Patent or Application. He has never been an officer, director, employee or shareholder of Lanpar, Ltd.

47. At the time that the Rule 116 Amendment was filed, Rhodes states that he was unaware of the facts described in Paragraphs

26, 35 and 42 above concerning Cikra, Bullen and Jones.

48. Prior to submission of the Affidavits to the PTO, Pardo and Landau were sent copies of unsigned drafts and signed final versions of such affidavits by Rhodes. Rhodes does not recall receiving any comments concerning the Affidavits' contents from Pardo or Landau.

49. On July 28, 1972, the PTO issued a notice of allowability [hereinafter the "Notice of Allowability"], stating that:

"All of the claims being allowable ... a Notice of Allowance or other appropriate communication will be sent in due course, in view of applicant's communication filed June 29, 1972, personal interview held with Pardo, Landau and Rhodes on 4–12–72 and 6–14–72, and an Examiner's Amendment will follow."

50. Had the PTO not been persuaded to withdraw the rejection on grounds of, *inter alia*, inadequate disclosure and to issue the Notice of Allowability on July 28, 1972, the Final Rejection would have stood and the application would have become automatically abandoned, unless appealed as of August 1, 1972. The PTO rules also permit an applicant to file a continuation application claiming the benefit of the filing date of the original application.

51. There is no indication in the patent prosecution record that the PTO ever issued an Examiner's Amendment, as referenced in the July 28, 1972 notice of allowability.

52. There is no indication in the patent prosecution record that, prior to March 5, 1973, the PTO ever issued a Notice of Allowance relating to the Application.

53. By office action dated March 5, 1973, the PTO specifically withdrew the July 28, 1972 notice of allowability, reopened the prosecution, and rejected all of the claims based on the U.S. Supreme Court decision in *Gottschalk v. Benson*, 409 U.S. 63, 93 S.Ct. 253, 34 L.Ed.2d 273 (1972), on the ground that the claims related to unpatentable subject matter.

54. The Board of Appeals of the PTO affirmed the rejection of the claims.

55. The United States Court of Customs and Patent Appeals reversed the action of the Board of Appeals. *In re Pardo,* 684 F.2d 912 (CCPA [C.C.P.A.] 1982).

56. On August 9, 1983, the Patent was issued to Pardo and Landau, without any indication in the patent prosecution record that the issue of the adequacy of disclosure in the underlying Patent Application was reconsidered at any time after issuance of the notice of allowability on July 28, 1972.

### ADDITIONAL FINDINGS OF FACT

Based on the testimony presented and the exhibits admitted during the bench trial, my additional factual findings pursuant to Rule 52 of the Federal Rules of Civil Procedure are as follows:

57. Both Rhodes, the attorney who prosecuted the Patent Application, and Martin J. Adelman, an expert who testified at trial on behalf of Lotus, have opined that the three Affidavits submitted to the PTO in 1972 were decisive in convincing the PTO that adequate disclosure had been made in the Patent Application and in reversing the PTO's prior rejection of the Patent Application for inadequate disclosure. Both men concur that that reversal cleared the way for the ultimate issuance of the Patent. Trial Transcript ("Trial Trans.") p. 110, ln. 21 to p. 111, ln. 14; Trial Trans. p. 190, ln. 6 to p. 196, ln. 21. I agree.

58. Adelman at trial painstakingly went through the procedural history of the Patent Application to show how it "overwhelmingly" demonstrated that the three Affidavits were not only considered by the PTO but resulted in the PTO's reversal of its earlier rejections of the Patent Application under § 112. Trial Trans. p. 190, ln. 6 to p. 196, ln. 21. I need not repeat that history here but merely underscore that the PTO had twice rejected the Patent Application for inadequate disclosure when it had before it affidavits from Pardo which attempted to convince it that persons of ordinary skill in the relevant art could reduce the specifications in the Patent Application to a working program because the

process was already in practice.[3] *Id.* In its second rejection of the Patent Application, the PTO explicitly noted that Pardo's affidavits were "self serving" and hence unpersuasive. *See* paragraph 9, *supra.* Although Pardo and Landau submitted a further Joint Statement to the PTO when they presented the three Affidavits, there is nothing in that Joint Statement, without the three Affidavits, which could have appreciably affected the PTO's earlier view that their affidavits were self-serving and unpersuasive.

59. Instead, the Joint Statement emphasized the importance of the three Affidavits by underscoring the very points confirmed by the Affidavits, i.e., that an average compiler writer and computer scientist, Jones, and two average computer programmers, Cikra and Bullen, using ordinary skill, could have written a program from the process described in the Patent Application. Cikra, the only one of the three affiants who created a program from the Patent Application disclosure, provided the first independent evidence that an average programmer could in fact reduce the disclosure in the Patent Application into a program without undue experimentation.

60. The Examiner's Notice of Allowability, *see* paragraph 49, *supra,* reversed the PTO's earlier rejections of the Patent Application and explicitly referenced the Examiner's reliance upon the June 29, 1972 "communication" from the applicants. That June 29, 1972 communication included the three Affidavits which were stamped and marked into the PTO's Index of records. Although the Notice also referenced reliance upon the PTO's interviews with Rhodes, Pardo and Landau, I, like Adelman, find that the prior

procedural history leaves no reasonable doubt that the three Affidavits by disinterested individuals who claimed to have been able to use their ordinary skills as programmers and compilers to convert the specifications into practice where the only new materials before the PTO that could have persuaded it to reverse its earlier rejection of the Patent Application. *Cf.* Trial Trans. at p. 192, ln. 19 to ln. 20 ("you don't have to be a rocket scientist to know what's going on").

61. I reject REFAC's argument that the Examiner could not have considered the three Affidavits because they were submitted after a final rejection of the Application without any showing justifying a late filing contrary to the dictates of 37 C.F.R. §§ 1.116(B) and 1.195 and Section 716 of the Manual of Patent Examining Procedure ("MPEP"). *See* Plaintiffs' Exhibit 11 (providing a copy of the relevant sections of the MPEP). As noted, the Joint Statement essentially repeated the arguments raised in Pardo's two earlier affidavits which affidavits the PTO had found unpersuasive and self-serving. The only new, disinterested information before the PTO was the three Affidavits that confirmed the points made by Pardo and Landau in their Joint Statement. The Examiner's agreement to permit Rhodes to submit the Affidavits, their entry in the PTO's Index, the Examiner's granting of an interview to discuss the Affidavits, and his reference to their submission in the Notice of Allowability, lead me to conclude that the Affidavits were an important, significant and motivating part of the reversal of the Patent Application rejection.

62. I also reject REFAC's claim that Section 716 of the 1972 "MPEP"[4] would have

---

**3.** In its first rejection, the Examiner noted that Pardo had failed to allege that he had reduced the process to practice without "undue experimentation." Because a patent disclosure, without undue experimentation, in essence "standing alone", must be sufficient to reduce a process to practice, the Examiner noted that Pardo's failure was significant. *See* Adelman testimony at Trial Trans. p. 190, ln. 13 to p. 191, ln. 18.

**4.** Section 716 of the 1972 MPEP, provided, in relevant part:
The following criteria are applicable to all affidavits and declarations submitted under rule 132:

(2) Affidavits or declarations must set forth facts, not merely conclusions. [Citation Omitted]. The facts presented in the affidavits or declarations must be pertinent to the rejection. [Citation Omitted] Otherwise, the affidavits or declarations have no probative value.
Rule 132 affidavits or declarations may be classified in five groups, and such affidavits or declarations must conform, in addition, to the established criteria and standards for the group into which they fall. These groups and the applicable standards are: ....
  5. SUFFICIENCY OF DISCLOSURE
Affidavits or declarations presented to show that the disclosure of an application is suffi-

compelled the Examiner not to rely upon the Jones or Bullen Affidavits because, unlike Cikra who converted the process into a program, the other two only rendered conclusory opinions without facts. I credit the opinion of Adelman that the two Affidavits did not contravene the MPEP. Trial Trans. at p. 181, ln. 6 to p. 182, ln. 2. They did not add facts to the specifications nor interpreted the specifications as prohibited by the MPEP, but instead offered an expert opinion on the very disputed issue before the Examiner, i.e., whether an individual with ordinary skill in the art could reduce the specifications, as written, to practice. The opinions set forth in great detail the qualifications of each Affiant and the materials they relied upon in rendering their opinions. Hence, I do not accept REFAC's argument that the two Affidavits were therefore inconsequential or immaterial to the Notice of Allowability.

63. I also reject REFAC's argument that somehow because the PTO withdrew the Notice of Allowability based on the Supreme Court's decision in *Gottschalk*, and because the PTO never mentioned the inadequate disclosure issue after the Notice of Allowance, the three Affidavits had no significance in the issuance of the Patent. The Notice of Allowability, secured by the submission of the three Affidavits, put to rest and rescinded a contested ground for rejecting the Patent Application. Absent an appeal or the filing of a continuing application, the prior rejection of the Patent Application for inadequate disclosure would have remained. *See* ¶ 50, *supra.* I find by clear and convincing evidence that the three Affidavits had a critical effect in the ultimate issuance of the Patent by removing one ground for rejection of the Patent Application. *See* Adelman Trial Testimony, Trans. at 196, ln. 13 to p. 197, ln. 6.

64. A PTO Examiner was required in 1972 to comment upon admitted affidavits. *See* MPEP § 716 at Plaintiff's Trial Exhibit 11 ("All admitted affidavits and declarations [should be] acknowledged and commented upon by the Examiner in his next succeeding

action.") Here, the Notice of Allowability mentioned the Examiner's reliance upon the submitted Affidavits but did not comment upon them because the Examiner's Amendment promised in the Notice was never issued. Thus, it is impossible to determine which of the three Affidavits, jointly or separately, persuaded the Examiner to grant the Patent Application. I do conclude, however, that cumulatively, the three Affidavits, which supported essentially the same proposition, caused the issuance of the Notice of Allowability.

65. Rhodes, when advising Pardo and Landau to seek disinterested affiants who were "strangers" in order to convince the PTO that the disclosures in the Patent Application were adequate, told them that he meant, and that the PTO would understand he meant, persons who had no financial dealings with Pardo, Landau, Lanpar or the Patent, and who had no familiarity with the process to be patented. Trial Trans. p. 111, ln. 17 to p. 112, ln. 13; p. 119, ln. 19 to p. 122, ln. 12.

66. Rhodes testified at trial that had he known the facts about Jones's and Cikra's prior employment with or exposure to the LANPAR Program, he would have considered them material enough to require that they be disclosed to the PTO, or insisted that another affiant be selected. Rhodes further admitted that any prior familiarity with the claimed invention was contrary to the "essence" of the purpose for providing the Affidavits to the PTO. Trial Trans. at p. 109, ln. 10 to p. 110, ln. 10; p. 111, ln. 17 to ln. 23.

67. Although none of the three Affidavits contained any affirmative misrepresentations by the affiants about their prior relationships with or knowledge of Lanpar, its Program or the patent invention, I also credit the opinion of Rhodes and Adelman that the PTO would have understood the three Affidavits to have been from disinterested affiants never employed by or with the applicants, and unfamiliar with the invention and that knowledge

---

cient to one skilled in the art are not acceptable to establish facts which the specification itself should recite. [Citation Omitted]

Affidavits or declarations purporting to explain the disclosure or to interpret the disclosure of a pending application are usually not considered. [Citation Omitted]

of the omitted information from the Jones and Cikra Affidavits would have been material to the Patent Examiner in assessing the credibility of the opinions rendered by the affiants. *Id.;* Adelman Trial Aff.[5] at ¶ 26–32. I nevertheless find that although the information concerning Bell Canada and the LANPAR Program in the Bullen Affidavit might have been of interest to the PTO, Bullen's lack of contact with Lanpar's license with Bell Canada or prior knowledge of the LANPAR Program would have rendered these disclosures less material to the PTO.

68. Landau and Pardo claim that Rhodes did not explain what he meant by disinterested parties. Trial Trans. at p. 62, ln. 23 to p. 63, ln. 1; p. 98, ln. 22 to p. 99, ln. 8. Landau admits, however, that he understood the purpose of the Affidavits was to demonstrate to the PTO that "disinterested parties" of relevant ordinary skill could review the disclosures in the Patent Application and reduce the invention into practice. Landau Trial Aff. at ¶ 5.

69. I do not credit Pardo's and Landau's claim, however, that Rhodes failed to explain to them what he meant by a "disinterested" affidavit or that they understood it to mean only individuals with no financial interest in the Patent. Neither do I credit their claim that they did not understand that prior knowledge of the Program was a matter to be disclosed in the Affidavits. Even a person unschooled in the PTO process would have and should have understood that a "disinterested" person meant an individual without knowledge of the Program. It is self defeating to have a person with knowledge of the invention process render an opinion that a person with ordinary skill in the art could review the application and reduce the specifications to practice.

70. I do not find, however, that Landau or Pardo intended to defraud the PTO by failing to disclose Lanpar's relationship with

Bell Canada in Bullen's 1972 affidavit. The emphasis in Rhodes's testimony concerning his descriptions to Landau and Pardo of what he termed "stranger" affidavits underscored that the affiant could not have either a financial interest in the Patent or any preexisting knowledge of the process contained in the Patent Application. Trial Trans. p. 111, ln. 17 to p. 112, ln. 13; p. 119, ln. 19 to p. 122, ln. 12. Although Bullen worked at Bell Canada, he had no financial or business stake in Bell Canada's license with Lanpar and no knowledge of the licensed product.

71. Prior to the time he was asked to provide his 1972 Affidavit, Bullen did not know that Lanpar was licensing a product to Bell Canada. Even after he was told of the license, he was not given any detailed knowledge of the licensed product. Bullen had never seen any programs, books or any other documents relating to the licensed product, nor had he ever used it. Neither he nor any of the persons who worked for him directly or indirectly had anything to do with the Lanpar product or with its licensing. The individuals who had any connection with and paperwork relating to the product worked in a different building at Bell Canada. Bullen Trial Aff. at ¶ 6. Before preparing or submitting his Affidavit, Bullen never attempted to obtain access to any documents relating to Lanpar's business dealings with Bell Canada. *Id.* at ¶ 7.

72. Moreover, Bullen never had any interest in the outcome of this action or in any business or venture of Pardo or Landau, or in the Patent at issue. He was not compensated for his Affidavit. *Id.* at ¶ 1.

73. I do not find that Landau or Pardo clearly understood from Rhodes that the desire of a "stranger" affidavit precluded every employee, even those completely uninvolved in his business venture with their employer like Bullen, from submitting an affidavit or that Bullen's contact with Bell Canada and

5. The direct testimony of witnesses at trial was submitted by way of affidavits. Paragraphs in the affidavit of a witness's direct testimony are referred to by the last name of the witness followed by *"[NAME]* Aff. ¶ ___ ". The following are a list of the pertinent affidavits submitted at trial with the trial exhibit numbers. The exhibit numbers are not repeated in the text of this Order.

| | |
|---|---|
| Bullen Aff. | Plaintiffs' Exhibit 15 |
| Landau Aff. | Plaintiffs' Exhibit 13 |
| Pardo Aff. | Plaintiffs' Exhibit 14 |
| Cikra Aff. | Plaintiffs' Exhibit 16 |
| Jones Aff. | Plaintiffs' Exhibit 17 |
| Adelman Aff. | Defendant's Exhibit KK |

its relationship with Lanpar was material to the disclosures to be made to the PTO. Thus, I do not find that there is clear and convincing evidence that Pardo and Landau intended to defraud the PTO by their omissions in the Bullen Affidavit.

74. The failure to make full disclosure in the Cikra Affidavit, however, presents a closer question about Landau's and Pardo's intent.

75. In order to market their LANPAR Program to Ohio Bell in early 1972, Landau and Pardo had to convert the Program, which had been written in FORTRAN and was being used elsewhere on a GE 425 computer, into computer language compatible with Datalogics's Xerox Sigma 7 computer. This conversion process did not require rewriting the Program; rather, it involved making certain technical adjustments so that Lanpar's product could be transferred to and used on the Sigma 7 computer. Cikra Trial Aff. at ¶¶ 4 and 5.

76. Cikra did the conversion work over a period of several days at the end of March 1972 in Cleveland in conjunction with Landau and to some extent, Pardo. *Id.* at ¶ 6. During this work, Cikra did not review the source codes of any of Landau's and Pardo's programs, except in part and where particular and specific need for the conversion process arose. *Id.* at ¶ 8.

77. Cikra never saw a complete source code and Cikra never made a printout of the source code after the conversion process was completed and the LANPAR Program was transferred to the Sigma 7. *Id.* at ¶ 8 and 10.

78. Cikra's 1972 Affidavit to the PTO stated that, based solely on the specification and figures in the Patent Application, and using knowledge of programming techniques known to him in 1970, he was able to create a program he called "COMPIL" which carried out the process described in the specification.

79. Cikra claims not to have used any knowledge or information he obtained during the conversion process when he wrote the "COMPIL" program described in his 1972 affidavit. *Id.* at ¶ 10.

80. Similarly, Cikra did not use any knowledge or information obtained from the sorting programs he wrote or compiler courses he took in college in creating the "COMPIL" program. *Id.* at 12 and 13.

81. Landau, when he worked with Cikra to provide his Affidavit to the PTO, did not "consider the question of whether Mr. Cikra's involvement was something that should be disclosed in the affidavit." Trial Trans. at p. 51, ln. 15 to ln. 18. Landau also did not recall telling Rhodes about Cikra's work on the Lanpar conversion. Trial Trans. at p. 68. ln. 14 to ln. 17.

82. Knowing that "disinterested" affidavits required affiants unfamiliar with the process sought to be patented, prudence should have dictated to Landau and Pardo the need to disclose to the PTO Cikra's involvement in the computer conversion of the LANPAR Program. Moreover, in light of Pardo's and Landau's argument that the PTO had erroneously understood that a person skilled in the art was a programmer, like Cikra, instead of a compiler, like Jones, prudence should also have suggested to them that they should include Cikra's prior sorting and compiler courses in his Affidavit.

83. On the other hand, I credit Landau's, Pardo's and Cikra's testimony that Cikra's exposure to the source code of the Program was limited and insufficient to give him any knowledge to convert the patent process into practice. Whether lack of familiarity with the invention process as described by Rhodes meant anyone who had come into any contact with the Program in any way, even peripherally to the opinion being rendered, was ambiguous enough so that I find no clear and convincing evidence of an intent by Landau or Pardo to defraud the PTO Examiner by their failure to include Cikra's limited contact with the Program in his Affidavit.

84. Similarly, I find no clear and convincing evidence of an intent to defraud the Examiner by the failure to mention in Cikra's Affidavit his one college compiler course or sorting program experience. There is no reason to believe that Landau, Pardo or Rhodes would have understood that the limited, unspecialized knowledge Cikra might have gained from those summer courses was

relevant to the opinion he was rendering to the PTO.

85. On the other hand, I can only conclude that the failure to disclose to the PTO Jones's prior employment with Lanpar and the Program was intentional.

86. In the preparatory discussions with Rhodes about his 1972 affidavit, Jones did not mention his prior employment with Lanpar because, he claims, of its informal nature and because he did not know it was relevant. Jones Trial Aff. at ¶ 10; Trial Trans. at p. 15, ln. 7 to ln. 23. Nevertheless, he did tell Rhodes and included in his Affidavit, detailed portions of his employment history, including mention of college summer work. Trial Trans. at p. 15, ln. 24 to p. 16, ln. 5.

87. Jones was exposed to and worked extensively with the LANPAR Program source code, flow charts and other documentation while employed with Lanpar. Trial Trans. at p. 6, ln. 6 to p. 10, ln. 17. He admits that when he left Lanpar's employment, he "had an understanding of the concepts used in the LANPAR program and could have written a similar program." Jones Trial Aff., at ¶ 6. Landau also admits that in addition to Pardo and himself, "Mr. Jones was the person who had the next best knowledge of [the P]rogram and how it worked." Trial Trans. at p. 55, ln. 11 to ln. 15.

88. Nevertheless, Jones claims that the opinion he gave in his 1972 Affidavit was not influenced by the knowledge he gained while working with Lanpar. Trial Trans. at p. 21, ln. 2 to p. 22, ln. 14.

89. Yet, in rendering his opinion in his Affidavit, Jones described what he did as follows:

Q. Mr. Jones, to follow up and complete the questions Mr. Gutman just asked you, could you explain to the Court what was, in fact, the process that you went through when you examined the specifications to come to your opinion that's set forth in your affidavit in 1972. What did you do?

A. Well, my first step was to read the document and see what was in it. And my first reaction was that the opening pages were kind of—they seemed like—like a kind of sales pitch about how—how good the product was going to be. And then I recognized the flow chart as being essentially the same one that Mr. Landau had shown me during—during one of our—one of our training sessions where he explains—where—where basically the—the heart of this is to—is explained. And I felt that the rest of the text, despite the stilted language, was an adequate disclosure of the way the program works.

Q. How long did it take you to do this analysis of the disclosure that led to your opinion?

A. It seems like—like a week or two.

Trial Trans. at p. 22, ln. 22 to p. 23, ln. 16.

90. Moreover, Landau admits that because of Jones's "additional knowledge" with the LANPAR Program, he was not asked to write a program from the specifications in the Patent Application but only to opine whether an ordinary computer scientist and compiler in 1972 could have written a program from the disclosures. Trial Trans. at p. 58, ln. 10 to p. 59, ln. 24.

91. Landau and Pardo claim they told Rhodes of Jones's employment history with them. Trial Trans. at 68, ln. 21 to p. 69, ln. 19; p. 93, ln. 19 to p. 95, ln. 7.

92. I do not credit this claim. There is no reason for Rhodes to have learned about Jones's prior experience and then accepted the Jones Affidavit. If given this information, the obvious alternative, as Rhodes testified, would have been for him to ask Landau and Pardo to find someone without Jones's experience to submit an Affidavit. Trial Trans. at p. 109, ln. 10 to p. 110, ln. 10; p. 111, ln. 17 to ln. 23. Thus, I conclude that Pardo and Landau purposely kept Jones's employment history from Rhodes.

93. Even though neither Landau nor Pardo remembers reviewing the affidavit of Jones before it was submitted to the PTO, Trial Trans. at p. 56, ln. 23 to p. 57, ln. 6; p. 89, ln. 23 to p. 90, ln. 6, Landau and Pardo were sent copies of the draft affidavit and final affidavit after it was executed. *See* ¶ 48, *supra; see also* Defendant's Exhibits P and Q. Pardo himself was actively involved in securing and providing Rhodes with the

background information of the three Affiants, particularly Jones. *See* Defendant's Exhibit Q. Because Jones's extensive experience with and knowledge of the LANPAR Program contradicted the very essence of the disinterested affidavit and because Landau and Pardo both knew about Jones's knowledge and its significance to the PTO's evaluation of the Affidavits to be submitted, I find by clear and convincing evidence that Landau and Pardo intentionally omitted this information from disclosure to the PTO with the intent to deceive the Examiner into allowing the Patent based in part on Jones's Affidavit.

### CONCLUSIONS OF LAW

94. This court has jurisdiction over this action pursuant to 28 U.S.C. § 1338, and venue is proper in this district under 28 U.S.C. § 1400.

95. I adopt herein any Finding of Fact previously set forth which might more properly be deemed a Conclusion of Law.

■ 96. A failure to disclose material information during the patent application process, with the intent to mislead or deceive the PTO Examiner into allowing the patent, may result in a conclusion that the applicant has engaged in "inequitable conduct" that renders a patent unenforceable. *Glaverbel Societe Anonyme v. Northlake Mktg. & Supply, Inc.,* 45 F.3d 1550, 1556 (Fed.Cir.1995); *LaBounty Mfg., Inc. v. United States Int'l Trade Comm'n.,* 958 F.2d 1066, 1070 (Fed. Cir.1992); *FMC Corp. v. Manitowoc Co., Inc.,* 835 F.2d 1411, 1415 (Fed.Cir.1987); *J.P. Stevens & Co. v. Lex Tex Ltd.,* 747 F.2d 1553, 1559 (Fed.Cir.1984), *cert. denied,* 474 U.S. 822, 106 S.Ct. 73, 88 L.Ed.2d 60 (1985).

■ 97. A finding of "inequitable conduct" requires clear and convincing evidence that the applicant (i) failed to disclose material information to the PTO (ii) with the intent to deceive or mislead the Examiner into allowing or granting the patent. *Glaverbel,* 45 F.3d at 1557; *Merck & Co. v. Danbury Pharmacal, Inc.,* 873 F.2d 1418, 1420 (Fed.Cir. 1989); *Kingsdown Medical Consultants, Ltd v. Hollister, Inc.,* 863 F.2d 867, 872 (Fed.Cir.

1988) (*en banc*), *cert. denied,* 490 U.S. 1067, 109 S.Ct. 2068, 104 L.Ed.2d 633 (1989).

■ 98. Upon a finding that both elements of materiality and intent are satisfied, the Court must then balance the elements to determine whether the applicant's conduct was inequitable, weighing both elements and their consequences under all of the circumstances; "[t]he more material the omission, the less culpable the intent required, and vice versa." *Halliburton Co. v. Schlumberger Tech. Corp.,* 925 F.2d 1435, 1439 (Fed.Cir. 1991); *see also Glaverbel,* 45 F.3d at 1557 (same); *American Hoist & Derrick Co. v. Sowa & Sons,* 725 F.2d 1350, 1368 (Fed.Cir.), *cert. denied,* 469 U.S. 821, 105 S.Ct. 95, 83 L.Ed.2d 41 (1984) (same).

99. The doctrine of inequitable conduct, including the governing standard of materiality, is derived from principles of common law known in 1972 when the Affidavits at issue here were submitted to the PTO. *See Precision Instrument Mfg. Co. v. Automotive Maintenance Mach. Co.,* 324 U.S. 806, 814–5, 65 S.Ct. 993, 997–8, 89 L.Ed. 1381 (1945); *Norton v. Curtiss,* 433 F.2d 779, 792–97 (C.C.P.A.1970); *Manville Sales Corp. v. Paramount Sys., Inc.,* 917 F.2d 544, 551–52 (Fed.Cir.1990); *Fox Indus., Inc. v. Structural Preservation Sys., Inc.,* 922 F.2d 801, 804 (Fed.Cir.1990) ("In 1977, the PTO clarified that the then Rule 56 merely 'codifie[d] the existing office policy on fraud and inequitable conduct, which is believed consistent with the prevailing case law in the federal courts' ") (quotation omitted).

■ 100. An omission by an applicant in information submitted to the Patent Examiner is material if there is a "substantial likelihood that a reasonable examiner would [have] consider[ed] it important in deciding whether to allow the application to issue as a patent." *Halliburton,* 925 F.2d at 1440; *Manville,* 917 F.2d at 551. "It is not necessary that the patent would not have issued but for the misrepresentation." *Merck & Co.,* 873 F.2d at 1421; *see also Fox Indus.,* 922 F.2d at 804. Moreover, materiality is presumed when false affidavits are submitted to the PTO in order to overcome the rejection of a patent application. *Procter & Gamble Co. v. Kimberly–Clark Corp.,* 740 F.Supp.

1177, 1197 (D.S.C.1989), *aff'd without opinion*, 907 F.2d 159 (Fed.Cir.1990) ("[T]here is no room to argue that submission of false affidavits is not material.") (quoting *Rohm & Haas Co. v. Crystal Chem. Co.*, 722 F.2d 1556, 1571 (Fed.Cir.1983), *cert. denied*, 469 U.S. 851, 105 S.Ct. 172, 83 L.Ed.2d 107 (1984)).[6]

■ 101. For the reasons in paragraphs 65–67, *supra*, I have found that the evidence clearly and convincingly demonstrates that a reasonable patent examiner would have considered the facts omitted from the Jones and Cikra Affidavits to be important in determining whether the previous rejection on grounds of inadequate disclosure had been overcome.

102. The "intent to deceive" element of inequitable conduct is satisfied where the "involved conduct, viewed in light of all the evidence, including evidence indicative of good faith, indicate[s] sufficient culpability to require a finding of intent to deceive" or to mislead the examiner into allowing the patent application. *Paragon*, 984 F.2d at 1189; *Therma–Tru Corp. v. Peachtree Doors, Inc.*, 44 F.3d 988, 995–996 (Fed.Cir.1995); *Kingsdown*, 863 F.2d at 876.

103. For the reasons discussed in paragraphs 70–93, *supra*, I find that the evidence does not clearly and convincingly demonstrate that Pardo and Landau intended to mislead the PTO with the omissions from the Bullen and Cikra Affidavits but it does clearly and convincingly demonstrate that Pardo and Landau intentionally and deliberately caused material information to be omitted from the Jones Affidavit with the intent to mislead the Examiner into allowing the Patent Application.

104. In light of the previous rejection of the Pardo Affidavit as "self serving," Pardo and Landau knew that a reasonable Examiner reviewing the Affidavits would conclude that the affiants were disinterested witnesses with no knowledge of the patent process, particularly where the affiants in great detail presented their education and employment history without any mention of the affiant's connections to the patent applicants or familiarity with the patent invention. Conversely, Landau and Pardo also knew that the PTO Examiner here would, when evaluating the Affidavits, consider it important to know whether the disinterested affiants had prior exposure to the patent process or its commercial Program.

105. Under the circumstances of the prior rejections by the PTO, Landau and Pardo knew that the omitted information concerning Jones's prior employment with Landau and Pardo and his extensive exposure to the patent process would have been highly material to the Examiner's weighing of the Jones Affidavit and in his determination as to whether the three Affidavits, jointly or separately, were sufficient to overcome the rejection on grounds of inadequate disclosure.

106. I recognize that the omission of material information in the Bullen and Cikra Affidavits through negligence or gross negligence would be insufficient to apply the doctrine of inequitable conduct. *See Kingsdown*, 863 F.2d at 876 (gross negligence does not equate with intent to deceive). However, in equitably weighing the consequence of the intentional and deceptive omission in the Jones Affidavit, I do consider that the effect

---

**6.** I find REFAC's position somewhat specious that *Paragon Podiatry Lab., Inc. v. KLM Lab., Inc.*, 984 F.2d 1182 (Fed.Cir.1993) requires that an actual misleading statement exist in an affidavit submitted to the PTO before a Court makes a finding of inequitable conduct. The *Paragon* court itself made it clear that although the intent to mislead the PTO could not be inferred from a mere nondisclosure, the inference could be drawn from the circumstances under which "the affirmative acts of submitting [the affidavits] [and] their misleading character" were made in convincing "an examiner to believe that the affiants were "disinterested" parties." *Id.*, at 1191. As far back as 1972 the Court in *Monsanto Co. v.*

*Rohm & Haas Co.*, 456 F.2d 592, 599 (3d Cir.), *cert. denied*, 407 U.S. 934, 92 S.Ct. 2463, 32 L.Ed.2d 817 (1972), held "[c]oncealment and nondisclosure may be 'evidence of and equivalent to a false representation, because the concealment or suppression is, in effect, a representation that what is disclosed is the whole truth.' " (citing *Stewart v. Wyoming Cattle Ranche Co.*, 128 U.S. 383, 9 S.Ct. 101, 32 L.Ed. 439 (1888)). Here, I have found that the detailed education and employment history set forth in the Affidavits would have led any reasonable Examiner to conclude that the affiants were being proffered as disinterested affiants with no prior knowledge of the patent invention.

of the fraudulent omission in the Jones Affidavit was heightened by the omissions in the other Affidavits.

107.   Weighing both the high materiality of the omitted information in the Jones Affidavit to the PTO's review of it and Pardo's and Landau's intent in misleading the Examiner, I conclude that the applicants here engaged in inequitable conduct sufficient to render the Patent unenforceable.

### CONCLUSION

I recognize the financial hardship the applicants here faced in prosecuting their Patent Application and in maintaining their invention confidential during the patent process.   I also recognize that rendering the Patent invalid is a harsh penalty.   The rich reward of a seventeen-year monopoly, however, comes at a price.   I simply do not accept that Landau and Pardo did not know or did not realize that Jones's prior employment exposure to their Program was a necessary disclosure in his Affidavit.

For the reasons discussed above, I find that defendant Lotus has met its burden of proving inequitable conduct before the PTO and I find, after weighing all circumstances, that plaintiffs' Patent should be rendered unenforceable because of that conduct.   The Clerk of the Court is directed to enter judgment in accordance with this Order in favor of defendant Lotus on its affirmative defense of inequitable conduct and dismiss the plaintiffs' complaint against the defendant.

**SO ORDERED.**