MAYER, Circuit Judge,
dissenting.
The issue of whether a claimed method meets the subject matter eligibility requirements contained in 35 U.S.C. § 101 is an “antecedent question” that must be addressed before this court can consider whether particular claims are invalid as obvious or anticipated. In re Comiskey, 554 F.3d 967, 975 n. 7 (Fed.Cir.2009). GraphOn Corporation (“GraphOn”) owns four patents, U.S. Patent Nos. 6,324,538 (the “'538 patent”), 6,850,940, 7,028,034, and 7,269,591, which contain exceedingly broad claims to a system that allows users to exert control over the content of their online communications. This court must first resolve the issue of whether the GraphOn patents are directed to an unpatentable “abstract idea” before proceeding to consider subordinate issues related to obviousness and anticipation. See Bilski v. Kappos, — U.S. -, 130 S.Ct. 3218, 3225, 177 L.Ed.2d 792 (2010) (noting that whether claims are directed to statutory subject matter is a “threshold test”); Parker v. Flook, 437 U.S. 584, 593, 98 S.Ct. 2522, 57 L.Ed.2d 451 (1978) (“Flook”) (emphasizing that “[t]he obligation to determine what type of discovery is sought to be patented” so as to determine whether it falls within the ambit of section 101 “must precede the determination of whether that discovery is, in fact, new or obvious”); Comiskey, 554 F.3d at 973 (“Only if the requirements of § 101 are satisfied is the inventor allowed to pass through to the other requirements for patentability, such as novelty under § 102 and ... non-obviousness under § 103.” (citations and internal quotation marks omitted)). I therefore respectfully dissent from the court’s judgment.
I.
“[A] principle is not patentable. A principle, in the abstract, is a fundamental truth; an original cause; a motive; these cannot be patented, as no one can claim in either of them an exclusive right.” Le Roy v. Tatham, 55 U.S. (14 How.) 156, 175, 14 L.Ed. 367 (1853). In Bilski, the Supreme Court rejected a method of hedging against risk in the commodities markets as an unpatentable “abstract idea.” 130 S.Ct. at 3230 (“[A]ll members of the Court agree that the patent application at issue here falls outside of § 101 because it claims an abstract idea.”). The Court explained that Bilski’s application essentially disclosed “the basic concept of hedging, or protecting against risk” and that allowing him “to patent risk hedging would preempt use of this approach in all fields, and would effectively grant a monopoly over an abstract idea.” Id. at 3231.
The claims of the GraphOn patents are significantly broader in scope and have the potential to wield far greater preemptive *1265 power than those at issue in Bilski In the mid-1990s, companies frequently relied on online service providers such as Yahoo! Corporation (“Yahoo”) to advertise their products and services on the Internet. See MySpace, Inc. v. Graphon Corp., 756 F.Supp.2d 1218, 1223 (N.D.Cal.2010) (“District Court Decision ”). According to GraphOn, Yahoo “arbitrarily edited and categorized each listing or database entry,” which resulted in Internet listings that contained “typographical errors” and “were difficult to search.” Id. The patents-in-suit purport to solve this problem by creating a system that allows users to control the content and categorization of their own database entries. See '538 patent, col.2, ll.61-64 (“The present invention ... uses a computer network and a database to provide a hardware-independent, dynamic information system in which the information content is entirely user-controlled.”). GraphOn alleges that its patents “changed the state of the art by empowering [users] to create an Internet or network presence under their own terms and for much cheaper.” Appellant Br. 12.
The potential scope of the GraphOn patents is staggering. They arguably cover any online system in which users control the content and categorization of their own communications. The claims thus cut across vast swaths of the Internet and potentially extend to most online advertising and social networking sites. See id. at 44 (stating that adoption of GraphOn’s claimed method has been so “widespread” that it “approaches] the level of a universal standard”). Indeed, GraphOn has already asserted its patents against many of the most influential participants in the Internet marketplace, including Yahoo, Google Inc., MySpace, Inc., Fox Audience Network, Inc., craigslist, Inc., AutoTrader.com, and eHarmony.com. See Joint App’x 35. To date, GraphOn has succeeded in obtaining lump-sum licensing agreements worth nearly $10 million for use of its claimed system. See Appellant Br. 12; Joint App’x 1607’
In rejecting Bilski’s application, the Supreme Court noted that “[hjedging is a fundamental economic practice long prevalent in our system of commerce and taught in any introductory finance class.” Bilski, 130 S.Ct. at 3231 (citations and internal quotation marks omitted). The GraphOn patents are likewise directed to a fundamental and widely understood concept. The idea that information can be stored in a computer database by one person and then accessed, in an unedited form, by another person is a fundamental tenet of network computing and one that is likely to be taught in any basic computer science course. Indeed, as the common specification to the GraphOn patents correctly notes, the claimed system operates much “[l]ike a publically-accessible bulletin board” because “the content that is posted ... is entirely within the control of the user, both at the time the entry is posted and all times thereafter.” '538 patent, col.10, ll.38-41.
The methods disclosed in Bilski’s application and in the GraphOn patents are not unpatentable because they lack any practical utility. To the contrary, they fall outside the ambit of section 101 because they are too useful and too widely applied to possibly form the basis of any patentable invention. Bilski’s claimed method was rejected because avoiding excessive economic risk has long been a cornerstone of commercial enterprise. See Bilski 130 S.Ct. at 3231. Here, the concept of allowing users to control the content of their online communications is “abstract” because free and unrestricted Internet communication has become a staple of contemporary life. Permitting GraphOn to exert monopoly power over any online system that allows users to control the content of their own communications would preempt use of one of the “basic tools” of modern social and *1266 commercial interaction.[1] Gottschalk v. Benson, 409 U.S. 63, 67, 93 S.Ct. 253, 34 L.Ed.2d 273 (1972) (“Benson ”) (emphasizing that “abstract intellectual concepts are not patentable, as they are the basic tools of scientific and technological work”); Flook, 437 U.S. at 593 n. 15, 98 S.Ct. 2522 (explaining that “in granting patent rights, the public must not be deprived of any rights that it theretofore freely enjoyed” (citations and internal quotation marks omitted)).
GraphOn cannot avoid the strictures of section 101 simply because its claimed method discloses very specific steps for allowing users to create and modify database entries. The Supreme Court has rejected the argument “that if a process application implements a principle in some specific fashion, it automatically falls within the patentable subject matter of § 101....” Flook, 437 U.S. at 593, 98 S.Ct. 2522. Indeed, Bilski’s application was deemed unpatentable notwithstanding the fact that claim 4 recited a mathematical formula for implementing the claimed method, Bilski, 130 S.Ct. at 3223, and claim 7 disclosed a specific method of using historical weather-related data in order to calculate how much a seller would “gain from each transaction under each historical weather pattern,” id. at 3224 (citations and internal quotation marks omitted). See also Flook, 437 U.S. at 593-95, 98 S.Ct. 2522 (concluding that a very specific method for updating an alarm limit during a catalytic conversion process was impermissibly abstract); Benson, 409 U.S. at 67-70, 93 S.Ct. 253 (rejecting as unpatentable a specific method of converting binary-coded decimals into pure binary numerals).
“[T]he patent system represents a carefully crafted bargain that encourages both the creation and the public disclosure of new and useful advances in technology, in return for an exclusive monopoly for a limited period of time.” Pfaff v. Wells Elecs., Inc., 525 U.S. 55, 63, 119 S.Ct. 304, 142 L.Ed.2d 261 (1998). A patentee does not uphold his end of this “bargain” if he seeks broad monopoly rights over a basic concept or fundamental principle without a concomitant contribution to the existing body of scientific and technological knowledge. Bilski’s application was rejected because it did not “add” anything to the basic concept of hedging against economic risk. Bilski, 130 S.Ct. at 3231 (emphasizing that Bilski’s “claims add even less to the underlying abstract principle than the invention in Flook did”). The claimed hedging method was deemed impermissibly abstract because it was implemented using only “familiar statistical approaches” and “well-known random analysis techniques.” Id. at 3224, 3231 (emphases added). In Benson, likewise, the Court rejected a method as patent ineligible where the mathematical procedures required by the claimed algorithm could “be carried out in existing computers long in use, no new machinery being necessary.” 409 U.S. at 67, 93 S.Ct. 253. Similarly, in Flook, the Court rejected an application where the claimed algorithm would be applied to “an otherwise conventional method” for catalytic conversion.[2] 437 U.S. at 588, 98 S.Ct. 2522.
*1267 Many software and business method patents simply describe a basic, well-known concept that has been implemented or applied using conventional computer technology. These “inventions” rely on functions — such as storing data, and organizing, outputting, and displaying information — that any general purpose computer routinely performs. While running a particular process on a computer undeniably improves efficiency and accuracy, cloaking an otherwise abstract idea in the guise of a computer-implemented claim is insufficient to bring it within section 101.[3] See Flook, 437 U.S. at 586, 98 S.Ct. 2522 (rejecting an application disclosing an algorithm that was “primarily useful for computerized calculations”); Benson, 409 U.S. at 71, 93 S.Ct. 253 (rejecting claims drawn to a method of converting binary-coded decimals which had “no substantial practical application except in connection with a digital computer”); CyberSource Corp. v. Retail Decisions, Inc., 654 F.3d 1366 (Fed. Cir.2011) (concluding that a method of detecting credit card fraud was patent ineligible, notwithstanding the fact that the patent recited the use of existing computers and the Internet). Given the ubiquity of computers in contemporary life, allowing a process to become patentable simply because it is computer-implemented or invokes the use of the Internet would render the subject-matter eligibility criteria contained in section 101 virtually meaningless. See Dealertrack, Inc. v. Huber, 674 F.3d 1315, 1333-34 (Fed.Cir.2012) (concluding that claims drawn to a “computer-aided” method of processing information through a clearinghouse fell outside the ambit of section 101); CyberSource, 654 F.3d at 1375 (emphasizing “that the basic character of a process claim drawn to an abstract idea is not changed by claiming only its performance by computers, or by claiming the process embodied in program instructions on a computer readable medium”).
In 1995, when the parent application for the GraphOn patents was filed, the Internet had already undergone “explosive” growth. '538 patent, col.l, 11.16-20. Furthermore, the practices of posting and searching for information over the Internet and of creating a searchable computer database were well-established. See District Court Decision, 756 F.Supp.2d at *1268 1222-25, 1232, 1239-41. It appears, therefore, that GraphOn simply took the concept of allowing a user to control the content and categorization of his own communications and implemented it using conventional computer technology.
II.
There are those who suggest section 101 should function as a wide and “broadly permissive” portal to patentability. Ultramercial, LLC v. Hulu, LLC, 657 F.3d 1323, 1326 (Fed.Cir.2011). They take the view that section 101 is a “coarse eligibility filter” and that other patent validity requirements — such as novelty, see 35 U.S.C. § 102, non-obviousness, see id. § 103, and adequate written description, see id. § 112 — should be used to weed out patents of dubious quality. Research Corp. Techs., Inc. v. Microsoft Corp., 627 F.3d 859, 869 (Fed.Cir.2010); but see Classen Immunotherapies, Inc. v. Biogen IDEC, 659 F.3d 1057, 1076 (Fed.Cir.2011) (Moore, J., dissenting) (arguing that a method directed to a schedule for administering immunizations “claimed a monopoly over the scientific method itself’ and was “so basic and abstract as to be unpatentable subject matter” under section 101).
There are several insurmountable problems with this approach. First, it has, as a practical matter, proved woefully inadequate in preventing a deluge of very poor quality patents. See Bilski, 130 S.Ct. at 3259 (Breyer, J., joined by Scalia, J., concurring in the judgment) (noting that patents granted in the wake of State St. Bank & Trust Co. v. Signature Fin. Group, Inc., 149 F.3d 1368, 1373 (Fed.Cir.1998), have “ranged from the somewhat ridiculous to the truly absurd” (citations and internal quotation marks omitted)). “[T]here is no evidence that relying on §§ 102, 103, or 112 will solve the problem [of poor quality business method and software patents]. This claim was made ten years ago. It is still being made now. At what point does this argument run out of credibility?” Gerard N. Magliocca, Patenting the Curve Ball: Business Methods and Industry Norms, 2009 BYU L.Rev. 875, 900 (2009) (footnote omitted).
More fundamentally, there is nothing in Bilski to suggest that section 101 can be subverted by a misplaced reliance on sections 102, 103, or 112. To the contrary, the Court reaffirmed section 101’s vital role by emphasizing that “[c]oncerns about attempts to call any form of human activity a ‘process’ can be met by making sure the claim meets the requirements of § 101.” Bilski, 130 S.Ct. at 3226. Thus, while the scope of section 101 is broad, it is not unbounded. Id. at 3225. Prohibitions against patenting abstract ideas, physical phenomena, and laws of nature “have defined the reach of the statute as a matter of statutory stare decisis going back 150 years.” Id. Indeed, the Court has explicitly rejected the contention that the section 101 subject matter eligibility analysis can be subsumed by the section 102 novelty and section 103 obviousness inquiries. See Flook, 437 U.S. at 588, 98 S.Ct. 2522 (rejecting an application under section 101 even where it was “assume[d]” that the application met the requirements of sections 102 and 103); see also Diehr, 450 U.S. at 190, 101 S.Ct. 1048 (“The question ... of whether a particular invention is novel [under section 102] is wholly apart from whether the invention falls into a category of statutory subject matter.” (citations and internal quotation marks omitted) (emphasis added)).
Bilski contains nothing to indicate that patents on methods of doing business will, as a general matter, meet section 101’s subject matter eligibility requirements.[4] *1269 Four justices of the Supreme Court concluded that claims drawn to methods of doing business are categorically ineligible for patent protection. Bilski, 130 S.Ct. at 3243 (Stevens, J., dissenting) (emphasizing that “regardless of how one construes the term ‘useful arts,’ business methods are not included”). While the five remaining justices declined to categorically exclude business methods from the scope of section 101, the Court[5] had nothing positive to say about affording patent protection to such methods. To the contrary, the Court emphasized that “[i]f a high enough bar is not set when considering patent applications of this sort, patent examiners and courts could be flooded with claims that would put a chill on creative endeavor and dynamic change.” Id. at 3229.[6] In fact, the Court gave a broad “hint” that while such methods were not categorically excluded from the scope of section 101, the statute’s abstract idea exception might be an appropriate vehicle by which this court could invalidate patents on methods of doing business:
[I]f the Court of Appeals were to succeed in defining a narrower category or class of patent applications that claim to instruct how business should be conducted, and then rule that the category is unpatentable because, for instance, it represents an attempt to patent abstract ideas, this conclusion might well be in accord with controlling precedent.

Id.

The Patent Clause of the Constitution empowers Congress to provide patent protection “[t]o promote the Progress of ... [the] useful Arts, by securing for limited Times to ... Inventors the exclusive Right to their ... Discoveries.” U.S. Const., art. I, § 8, cl. 8. The Supreme Court has cautioned that “[t]his is the standard expressed in the Constitution and it may not be ignored.” Graham v. John Deere Co., 383 U.S. 1, 6, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966). By delineating the “kind of discoveries” that ought to be afforded patent protection, Flook, 437 U.S. at 593, 98 S.Ct. 2522, section 101 is designed to meet the “great challenge” of “striking the balance between protecting inventors and not granting monopolies over procedures that others would discover by independent, creative application of general principles,” Bilski, 130 S.Ct. at 3228. A robust application of section 101 is required to ensure that the patent laws comport with their constitutionally-defined objective. See Diehr, 450 U.S. at 192, 101 S.Ct. 1048 (explaining that a process claim meets the requirements of section 101 when, “considered as a whole,” it “is performing a func *1270 tion which the patent laws were designed to protect”).

. The GraphOn patents likewise raise significant First Amendment concerns by granting a private party the right to impose broad restrictions on the free flow of ideas and information over the Internet.

. The question of whether a claimed method is implemented using only conventional or well-known means is, of course, directly relevant to the issue of whether it satisfies section 103’s non-obviousness requirements. However, that question can also be important in determining whether a claimed method recites patent eligible subject matter. To the extent that a claimed method can be implemented using "well-known ... techniques,” Bilski, 130 S.Ct. at 3231, "existing comput *1267 ers,” Benson, 409 U.S. at 67, 93 S.Ct 253, or "conventional method[s],” Flook, 437 U.S. at 588, 98 S.Ct. 2522, it is likely that the applicant is seeking patent protection for an idea itself rather than for a particular application of that idea. In essence, the use of conventional technology to implement an otherwise abstract idea is insufficient to bring a process within the ambit of section 101 because it constitutes nothing more than "insignificant postsolution activity.” Diamond v. Diekr, 450 U.S. 175, 191-92, 101 S.Ct. 1048, 67 L.Ed.2d 155 (1981) ("Diekr”) ("[I]nsignificant postsolution activity will not transform an unpatentable principle into a patentable process.”).

. In Diehr, the Supreme Court made clear that an application drawn to statutory subject matter does not become patent ineligible simply because it recites the use of a computer. 450 U.S. at 185, 101 S.Ct. 1048. The Court noted that "[(Industrial processes” have historically been eligible for patent protection and concluded "that a physical and chemical process for molding precision synthetic rubber products falls within the § 101 categories of possibly patentable subject matter.” Id. at 184, 101 S.Ct. 1048. The Court emphasized that the application was "not limited to the isolated step of programming a digital computer,” but instead "describe[d] a process of curing rubber beginning with the loading of the mold and ending with the opening of the press and the production of a synthetic rubber product that has been perfectly cured — a result heretofore unknown in the art.” Id. at 193 n. 15, 101 S.Ct. 1048 (internal quotation marks omitted). In other words, the application was patent eligible because it did not simply take a well-known concept or algorithm and implement it on a computer, but instead disclosed a new — "heretofore unknown in the art” — technology for curing rubber.

. The costs of our broken patent system are not abstract. See L. Gordon Crovitz, “Google, Motorola and the Patent Wars,’’ Wall St. J., Aug. 22, 2011. Because technology companies are forced to spend enormous sums *1269 defending against vague and overbroad software and business method claims, they have far fewer dollars to expend on research and development. Id. ("Hobbled by a costly patent system, the technology industry is not the engine for global wealth and productivity it could be.”).

. Significantly, Justice Scalia did not join large sections of the plurality opinion. While he joined the portion of the Court’s opinion stating that business methods qualified as “processes” and were therefore not categorically excluded from the scope of section 101, Bilski, 130 S.Ct. at 3228, he did not join Part II-C-2 of the opinion, which states that “the Patent Act leaves open the possibility that there are at least some processes that can be fairly described as business methods that are within patentable subject matter under § 101,” id. at 3229.

. The Court also emphasized that “some business method patents raise special problems in terms of vagueness and suspect validity,” and that while the First Inventor Defense Act of 1999, 35 U.S.C. § 273(b)(1), "appears to leave open the possibility of some business method patents, it does not suggest broad patentability of such claimed inventions.” Bilski, 130 S.Ct. at 3229 (citations and internal quotation marks omitted).