MAYER, Circuit Judge,
concurring.
I agree that all claims on appeal fall outside of 35 U.S.C. § 101. I write separately, however, to make two points: (1) patents constricting the essential channels of online communication run afoul of the First Amendment; and (2) claims directed to software implemented on a generic computer are categorically not eligible for patent.
I.
“[T]he Constitution protects the right to receive information and ideas.... This right to receive information and ideas, regardless of their social worth, is fundamental to our free society.” Stanley v. Georgia, 394 U.S. 557, 564, 89 S.Ct. 1243, 22 L.Ed.2d 542 (1969) (citations omitted). Patents, which function as government-sanctioned monopolies, invade core First Amendment rights when they are allowed to obstruct the essential channels of scientific, economic, and political discourse. See United States v. Playboy Entm’t Grp., Inc., 529 U.S. 803, 812, 120 S.Ct. 1878, 146 L.Ed.2d 865 (2000) (“The distinction between laws burdening and laws banning speech is but a matter of degree.”); see also In re Tam, 808 F.3d 1321, 1340 (Fed. Cir. 2015) (en banc) (explaining that the government may impermissibly burden speech “even when it does so indirectly”).
Although the claims at issue here disclose no new technology, they have the potential to disrupt, or even derail, large swaths of online communication. U.S. Patent No. 6,460,050 (the “ '050 patent”) purports to cover methods of “identifying characteristics of data files,” '050 patent, col. 8 1. 13, whereas U.S. Patent No. 6,073,142 (the “'142 patent”) broadly claims *1323 systems and methods which allow an organization to control internal email distribution, '142 patent, col. 1 11. 15-34. U.S. Patent No. 5,987,610 (the “'610 patent”) describes, in sweeping terms, screening a communication for viruses or other harmful content at an intermediary location before delivering it to an addressee. See '610 patent, col. 14 11. 34-47. The asserted claims speak in vague, functional language, giving them the elasticity to reach a significant slice of all email traffic. See Gottschalk v. Benson, 409 U.S. 63, 69, 93 S.Ct. 253, 34 L.Ed.2d 273 (1972) (“Benson”) (explaining that claims are patent eligible only if they contain limitations “sufficiently definite to confine the patent monopoly within rather definite bounds”).. Indeed, the claims of the '610 patent could reasonably be read to cover most methods of screening for harmful content while data is being transmitted over a network. See '610 patent, col. 1 11. 59-61 (describing “screening] computer data for viruses within a telephone network before communicating the computer data to an end user”).
Suppression of free speech is no less pernicious because it occurs in the digital, rather than the physical, realm. “[W]hatever the challenges of applying the Constitution to ever-advancing technology, the basic principles of freedom of speech and the press, like the First Amendment’s command, do not vary when a new and different medium for communication appears.” Brown v. Entm’t Merchs. Ass’n, 564 U.S. 786, 790, 131 S.Ct. 2729, 180 L.Ed.2d 708 (2011) (citations and internal quotation marks omitted). Essential First Amendment freedoms are abridged when the Patent and Trademark Office (“PTO”) is permitted to balkanize the Internet, granting patent owners the right to exact heavy taxes on widely-used conduits for online expression.
Like all congressional powers, the power to issue patents and copyrights is circumscribed by the First Amendment. See Golan v. Holder, — U.S. -, 132 S.Ct. 873, 889-93, 181 L.Ed.2d 835 (2012); Eldred v. Ashcroft, 537 U.S. 186, 219-21, 123 S.Ct. 769, 154 L.Ed.2d 683 (2003). In the copyright context, the law -has developed “built-in First Amendment accommodations.” Eldred, 537 U.S. at 219, 123 S.Ct. 769; see also Park ’N Fly, Inc. v. Dollar Park & Fly, Inc., 469 U.S. 189, 201, 105 S.Ct. 658, 83 L.Ed.2d 582 (1985) (noting that the Lanham Act contains safeguards to prevent trademark protection from “tak[ing] from the public domain language that is merely descriptive”). Specifically, copyright- law “distinguishes between ideas and expression and makes only the latter eligible for copyright protection.” Eldred, 537 U.S. at 219, 123 S.Ct. 769; see also Harper & Row Publishers, Inc. v. Nation Enters., 471 U.S. 539, 556, 105 S.Ct. 2218, 85 L.Ed.2d 588 (1985) (explaining that “copyright’s idea/expression dichotomy” supplies “a definitional balance between the First Amendment and the Copyright Act by permitting free communication- of facts while still protecting an author’s expression” (citations and internal quotation marks omitted)). It also applies a- “fair use” defense, permitting members of “the public to use not only facts and ideas contained in a copyrighted work, but also expression itself in certain circumstances.” Eldred, 537 U.S. at 219, 123 S.Ct. 769; see 17 U.S.C. § 107 (“[T]he fair use of a. copyrighted work, including such use by reproduction in copies .... for purposes such as criticism, comment, news reporting, teaching (including multiple copies for classroom use), scholarship, or research, is not an infringement of copyright.”). -
Just as the idea/expression dichotomy and the fair use defense serve to keep copyright protection from abridging free speech rights, restrictions on subject mat *1324 ter eligibility can be used to keep patent protection within constitutional bounds. Section 101 creates a “patent-free zone” and places within it the indispensable instruments of social, economic, and scientific endeavor. See Alice Corp. v. CLS Bank Int’l, — U.S.-, 134 S.Ct. 2347, 2354, 189 L.Ed.2d 296 (2014) (emphasizing that the “building blocks of human ingenuity” are patent, ineligible); Benson, 409 U.S. at 67, 93 S.Ct. 253 (stating that “mental processes ... and abstract intellectual concepts are not patentable, as they are the basic tools of scientific and technological work”).. Online communication has become a “basic tool[ ],” Benson, 409 U.S. at 67, 93 S.Ct. 253, of modern life, driving innovation and supplying a widely-used platform for political dialogue. See Ultramercial, Inc. v. Hulu, LLC, 772 F.3d 709, 716 (Fed. Cir. 2014) (noting that the Internet “is a ubiquitous information-transmitting medium”); see also U.S. Telecom Ass’n v. Fed. Commc’n Comm’n, 825 F.3d 674, 698 (D.C. Cir, 2016) (explaining that opline communication “has transformed nearly every aspect of our lives, from profound actions like choosing a leader1, building a career, and falling in love to more quotidian ones like hailing a cab and watching a movie”). Section 101, if .properly applied, can preserve the. Internet’s open architecture and weed out those patents that chill political expression and impermissibly obstruct the marketplace of ideas.
As both the Supreme Court and this court have recognized, section 101 imposes “a threshold test,” Bilski v. Kappos, 561 U.S. 593, 602, 130 S.Ct. 3218, 177 L.Ed.2d 792 (2010), one that must be satisfied before a coürt can proceed to consider subordinate validity issues such as non-obviousness under 35 U.S.C. § 103 or adequate written description under 35 U.S.C.,§ 112. See Parker v. Flook, 437 U.S. 584, 593, 98 S.Ct. 2522, 57 L.Ed.2d 451 (1978) (“Flook”) (“The obligation to determine what type of discovery is sought to be patented” so as to determine whether it falls within the ambit of section 101 “must precede the determination of whether that discovery is, in fact, new or obvious.”); In re Comiskey, 554 F.3d 967, 973 (Fed. Cir. 2009) (“Only if the requirements of § 101 are satisfied is the inventor allowed to pass through to the other requirements for patentability, such as novelty under § 102. and ... non-obviousness under § 103.” (citations and internal quotation marks omitted)); State St. Bank & Trust Co. v. Signature Fin. Grp., Inc., 149 F.3d 1368, 1372 n.2 (Fed. Cir. 1998) (explaining that section 101 is “[t]he first door which must be opened on the difficult path to patentability” (citations and internal quotation marks omitted)). Indeed, if claimed subject matter is not even eligible . for patent protection, any pronouncement on whether it is novel or adequately supported by the written description constitutes an impermissible advisory opinion. See, e.g., Golden v. Zwickler, 394 U.S. 103, 108, 89 S.Ct. 956, 22 L.Ed.2d 113 (1969) (emphasizing that Article III courts “do not render advisory opinions” (citations and internal quotation marks omitted));
The public has a “paramount interest in seeing that patent monopolies ... are kept within their legitimate scope.” Cuozzo Speed Techs., LLC v. Lee, — U.S.-, 136 S.Ct. 2131, 2144, 195 L.Ed.2d 423 (2016) (citations and internal quotation marks omitted); see also Medtronic, Inc. v. Mirowski Family Ventures, LLC, — U.S. -, 134 S.Ct. 843, 851, 187 L.Ed.2d 703 (2014). .Nowhere is that interest more compelling than in the context of claims that threaten fundamental First Amendment freedoms. See Palko v. Connecticut, 302 U.S. 319, 326-27, 58 S.Ct. 149, 82 L.Ed. 288 (1937) (“[F]reedom of thought and speech ... is the matrix, the indispensable condition, of nearly every other form of *1325 freedom.”). “As the most participatory form of mass speech yet developed, the Internet deserves the highest protection from governmental intrusion.” ACLU v. Reno, 929 F.Supp. 824, 883 (E.D. Pa. 1996), aff'd, 521 U.S. 844, 117 S.Ct. 2329, 138 L.Ed.2d 874 (1997). A robust application of section 101 at the outset of litigation will ensure that the essential channels of online communication remain “free to all men and reserved exclusively to none,” Funk Brothers Seed Co. v. Kalo Inoculant Co., 333 U.S. 127, 130, 68 S.Ct. 440, 92 L.Ed. 588 (1948).
II.
Most of the First Amendment concerns associated with patent protection could be avoided if this court were willing to acknowledge that Alice sounded the death knell for software patents. The claims at issue in Alice• were directed to a computer-implemented system for mitigating settlement risk. 134 S.Ct. at 2352-53. Although the petitioners argued that their claims were patent eligible because they were tied to a computer and a computer is a tangible object, the Supreme Court unanimously and emphatically rejected this argument. Id. at 2358-60. The Court explained that the “mere recitation of a generic computer cannot transform a patent-ineligible abstract idea into a patent-eligible invention.” Id. at 2358. Accordingly, “[t]he fact that a computer necessarily exist[s] in the physical, rather than purely conceptual, realm is beside the point” in the section 101 calculus. Id. (citations and internal quotation marks omitted).
Software is a form of language—in essence, a set of instructions. See Microsoft Corp. v. AT&T Corp., 550 U.S. 437, 447, 127 S.Ct. 1746, 167 L.Ed.2d 737 (2007) (explaining that “software” is “the set of instructions, known as code, that directs a computer to perform specified functions or operations” (citations and internal quotation marks omitted)); see also 17 U.S.C. § 101 (defining a “‘computer program,’” for purposes of the Copyright Act, as “a set of statements or instructions to be used directly or indirectly in a computer in order to bring about a certain result”). It is inherently abstract because it is merely “an idea without physical embodiment,” Microsoft, 550 U.S. at 449, 127 S.Ct. 1746 (emphasis added). Given that an “idea’’ is not patentable, see, e.g., Benson, 409 U.S. at 67, 93 S.Ct. 253, and a generic computer is “beside the point” in the eligibility analysis, Alice, 134 S.Ct. at 2358, all software implemented on a standard computer should be deemed categorically outside the bounds of section 101.
The central problem with affording patent protection to generically-implemented software is that standard computers have long been ceded to the public domain. See Flook, 437 U.S. at 593 n.15, 98 S.Ct. 2522 (“[I]n granting patent rights, the public must not be deprived of any rights that it theretofore freely enjoyed” (citations and internal quotation marks omitted)). Because generic computers are ubiquitous and indispensable, in effect the “basic tool[ ],” Benson, 409 U.S. at 67, 93 S.Ct. 253, of modern life, they are not subject to the patent monopoly. In the section 101 calculus, adding software (which is as abstract as language) to a conventional computer (which rightfully resides in the public domain) results in a patent eligibility score of zero. See Alice, 134 S.Ct. at 2358 (“Stating an abstract idea while adding the words ‘apply it with a computer’ simply combines those two steps, with the same deficient result.”).
Software lies in the antechamber of patentable invention. Because generically-implemented software is an “idea” insufficiently linked to any defining physical structure other than a standard computer, *1326 it is a precursor to technology rather than technology itself. See Mackay Radio & Tel Co. v. Radio Corp., 306 U.S. 86, 94, 59 S.Ct. 427, 83 L.Ed. 506 (1939) (“While a scientific truth, or the mathematical expression of it, is not patentable invention, a novel and useful structure created with the aid of knowledge of scientific truth may be.”). It is well past time to return software to its historical dwelling place in the domain of copyright.Nee Benson, 409 U.S. at 72, 93 S.Ct. 253 (citing a report from a presidential commission explaining that copyright is available to protect software and that software development had “undergone substantial and satisfactory growth” even without patent protection (citations and internal quotation marks omitted)); Oracle Am., Inc. v. Google Inc., 750 F.3d 1339, 1380 (Fed. Cir. 2014) (noting that “several commentators” have “argue[d] that the complex and expensive patent system is "a terrible fit for the fast-moving software industry” and that copyright provides “[a] perfectly adequate means of protecting and rewarding software developers for their ingenuity” (citations and internal quotation marks omitted)); Peter S. Menell, An Analysis of the Scope of Copyright Protection for Application Programs, 41 Stan. L. Rev. 1045,1076 (1989) (explaining that patents were historically “not seen as a viable option for the protection of most application program code” and that many software' programs “simply do not manifest sufficient novelty or nonobviousness to merit patent protection”).
. Software development has flourished despite—not because of—the availability of expansive patent protection. See Brief of Amicus Curiae Elec. Frontier Found, in Support of Respondents, Alice, 134 S.Ct. 2347 (No.-13-298), 2014 WL 828047, at *6-7 (“EFF Brief’) (“The software market began its rapid increase in the early 1980s ... more than a decade before the Federal Circuit concocted widespread software patents in 1994.... Obviously, no patents were needed for software to become a $60 billion/year industry by 1994.”); Mark A. Lemley, Software Patents and the Return of Functional Claiming, 2013 Wis. L. Rev. 905, 935 (2013) (“Software patents ... have created a large number of problems for the industry, particularly for the most innovative and productive companies.... [T]he existence of a vibrant open source community suggests that innovation can flourish in software absent patent protection.” (footnote omitted)); Wendy Seltzer, Software Patents andlor Software Development, 78 Brook. L. Rev. 929, 930 (2013) (“Seltzer”) (“Present knowledge and experience now offer sufficient evidence that patents disserve software innovation.”); Arti K. Rai, John R. Allison, & Bhaven N. Sampat, University Software Ownership and Litigation: A First Examination, 87 N.C. L. Rev. 1519, 1555-56 (2009) (“While most small biotechnology firms that receive venture financing have patents, the available empirical evidence indicates that most software start-ups that receive venture financing, particularly in the first round, do not have patents.”).
From an eligibility perspective, software claims suffer from at least four insurmountable problems. First, their scope is generally vastly disproportionate to their technological disclosure. In assessing patent eligibility, “the underlying functional concern ... is a relative one: how much future innovation is foreclosed relative to the contribution of the inventor.” Mayo Collaborative Servs. v. Prometheus Labs., Inc., — U.S.-, 132 S.Ct. 1289, 1303, 182 L.Ed.2d 321 (2012); see also Motion Picture Patents Co. v. Universal Film Mfg. Co., 243 U.S. 502, 513, 37 S.Ct. 416, 61 L.Ed. 871 (1917) (“[T]he inventor [is entitled to] the exclusive use of just what his inventive genius has discovered. It is *1327 all that the statute provides shall be given to him and it is all that he should receive, for it is the fair as well as the statutory-measure of his reward for his contribution to the public stock of knowledge,”). Software patents typically do not include any actual code developed by the patentee, but instead describe, in intentionally vague and broad language, a particular goal or objective. See Dan L. Burk & Mark A. Lemley, Is Patent Law Technology-Specific?, 17 Berkeley Tech. L. J. 1155, 1164-65 (2002) (“Unfortunately, the Federal Circuit’s peculiar direction in the software enablement cases has effectively nullified the disclosure requirement for software patents. And since source code is normally kept secret, software patentees generally disclose little or no detail about their programs to the public.” (footnote omitted)). Here, for example, the '610 patent discusses the objective of “screening] computer data for viruses ... before communicating the computer data to an end user,” '610 patent, col. 111. 59-61, but fails to disclose any specific, inventive guidance for achieving that goal. In effect, the '610 patent, like most software patents, describes a desirable destination but neglects to provide any intelligible roadmap for getting there.
A second, and related, problem with software patents is that they provide incentives at the wrong time. Because they are typically obtained at the “idea” stage, before any real inventive work has been done, such patents are incapable of effectively incentivizing meaningful advances in science and technology. “A player focused on patenting can obtain numerous patents without developing any of the technologies to useful levels of deployment or disclosure, leaving a minefield of abstract patent claims for others who actually deploy software.” Seltzer, 78 Brook. L. Rev. at 931. Here, for example, it took no significant inventive effort to recognize that communications should be screened for harmful content before delivery. The hard work came later, when software developers created screening systems capable of preventing our email boxes from being overrun with spam or disabled by viruses. Granting patents on software “ideas”—before they have been actually reduced to practice— has created a perverse incentive scheme. Under our current regime, those who scamper to the PTO early, often equipped with little more than vague notions about using computers to automate well-known business and social practices, can reap hefty financial dividends. By contrast, those who actually create and deploy useful computer-centric products are “rewarded” with mammoth potential infringement liability. See id. at 972 (“In software ... the long road from idea to implementation often snags on patents early in the course. Engineers can describe what they want software to do—in terms that have been sufficient for the PTO—well before they have made it work. Pressures to patent early produce a thicket of pre-implementation claims.”); EFF Brief, 2014 WL 828047, at *23 (describing a study which “found that between 2007 and 2011, 46 percent of patent lawsuits involved software patents, accounting for 89 percent of the increase in the number of patent defendants during this timeframe”).
Yet another intractable problem with software patents is their sheer number. See Brief of Amici Curiae Checkpoint Software, Inc. et al. .in Support of Respondents, Alice, 134 S.Ct. 2347(No. 13-298), 2014 WL 1815250, at *8 (“[Bjecause computer -products—as opposed to patents—inevitably integrate complex, multi-component technology, any given product is potentially subject to a large number of patents.... Some industry experts have estimated that 250,000 patents go into a modern smartphone.” (citations omitted)). Given the vast number of software pat *1328 ents—most of which are replete with broad, functional claims—it is virtually impossible to innovate in any technological field without being ensnared by the patent thicket. See id. (describing the “overwhelming set of overlapping patent rights that impede innovation”). Software patents impose a deadweight loss on the nation’s economy, erecting often insurmountable barriers to innovation and forcing companies to expend exorbitant sums defending against meritless infringement suits. See Shawn P. Miller, “Fuzzy” Software Patent Boundaries and High Claim Construction Reversal Rates, 17 Stan. Tech. L. Rev. 809, 810 (2014) (“Patent litigation is so expensive it has been described as the .sport of kings_ These expenses, however, may be dwarfed by the social cost of patent litigation in reducing incentives for producers to bring innovative products to market.” (footnote and internal quotation marks omitted)).
Fourth, and most fundamentally, generically-implemented software invariably lacks the concrete borders the patent law demands. See, e.g., Digital Equip. Corp. v. AltaVista Tech., Inc., 960 F.Supp. 466, 462 (D. Mass. 1997) (“The Internet has no territorial boundaries. To paraphrase Gertrude, Stein, as far as the Internet is concerned, not only is there perhaps ‘no there there,’ the ‘there’ is everywhere where there is Internet access.”). Patent protection is all about boundaries. An applicant has the right to obtain a patent only if he can describe, with reasonable clarity, the metes and bounds of his invention. See Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co., 636 U.S. 722, 730, 122 S.Ct. 1831, 162 L.Ed.2d 944 (2002) (explaining that the patent “monopoly is a property right[] and like any property right, its boundaries should be clear”). A properly issued patent claim represents a line of demarcation, defining the territory over which the patentee can exercise the right to exclude. See Nautilus, Inc. v. Biosig Instruments, Inc., — U.S.-, 134 S.Ct. 2120, 2129, 189 L.Ed.2d 37 (2014) (emphasizing that “a patent must be precise enough to afford clear notice of what is claimed, thereby apprising] the public of what is still open to them” (citations and internal quotation marks omitted)).
Software, however, is akin to a work of literature or a piece of music, undeniably important, but too unbounded, i.e., too “abstract,” to qualify as a patent-eligible invention. See Microsoft, 550 U.S. at 447-48, 127 S.Ct. 1746 (explaining that software “instructions ... detached from any medium” are analogous to “[t]he notes of Beethoven’s Ninth Symphony”). And, as discussed previously, given that generic computers are both omnipresent and indispensable, they are incapable of providing structure “sufficiently definite to confine the patent monopoly within rather definite bounds,” Benson, 409 U.S. at 69, 93 S.Ct. 253. In short, because directing that software should be applied via standard computer elements is little different than stating that it should be written down using pen and paper, generically-implemented software lacks the concrete contours required by section 101. See Alice, 134 S.Ct. at 2352 (emphasizing that “merely requiring generic computer implementation” does not remove claims from the realm of the abstract).
Declaring that software implemented on a generic computer falls outside of section 101 would provide much-needed clarity and consistency in our approach to patent eligibility. It would end the semantic gymnastics of trying to bootstrap software into the patent system by alleging it offers a “specific method of filtering Internet content,” see BASCOM Global Internet Servs., Inc. v. AT&T Mobility LLC, 827 F.3d 1341, 1350 (Fed. Cir. 2016), makes the computer faster, see Enfish, LLC v. *1329 Microsoft Corp., 822 F.3d 1327, 1337-39 (Fed. Cir. 2016), or the Internet better, see DDR Holdings, LLC v. Hotels.com, L.P. 773 F.3d 1245, 1257 (Fed. Cir. 2014), just to snuggle wp to a casual bit of dictum in Alice, 13k S.Ct. at 2359. Software-runs computers and the Internet; improving them up to the current limits of technology is merely more of the same.' The claims at issue in BASCOM, Enfísh, and DDR, like those found patent ineligible in Alice, do “no more than require a generic computer to perform generic computer functions,” Alice, 134 S.Ct. at 2359. Eliminating ge-nericdlly-implemented software patents would clear the patent thicket, ensuring that patent protection promotes, rather than impedes, “the onward march of science,” O’Reilly v. Morse, 56 U.S. (15 How.) 62, 113, 14 L.Ed. 601 (1853), and allowing technological innovation to proceed' apace.